UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PAT SNYDER and                    :
ALEXIS DAVIES                     :
                                  :
v.                                :   CIV. NO. 3:02CV1538 (HBF)
                                  :
RONALD PUGLIESE and               :
PETER BOSCO                       :
                                  :
                                  :

RULING ON MOTION TO DISMISS
AND MOTION FOR SUMMARY JUDGMENT

Pat Snyder and Alexis Davies bring this civil rights action against Naugatuck Police Officers Ronald Pugliese and Peter Bosco in their individual capacities, alleging a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Plaintiffs also vaguely allege violations of state, municipal, and common law.[1]

Pending are defendants' Motion for Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b). **[Doc. #30].**

Defendants assert five grounds for granting their motion: (1) plaintiffs' claim is directed toward the defendants in their individual capacities and a Fourteenth Amendment claim may only

---

[1]Plaintiffs allege that defendants acted "under the color of the constitution, statutes, laws, ordinances, rules, regulations, customs and usages of the State of Connecticut and the Town and Borough of Naugatuck." [Doc. #1, Compl. at ¶5].  However, plaintiffs fail to allege specific violations of the Constitution of Connecticut, state statutes, or municipal ordinances. Plaintiffs allege that defendants had a duty to protect plaintiffs and that their failure to perform such duty proximately caused plaintiffs' alleged injuries. Id. at ¶6. Finally, plaintiffs allege that defendants' actions, or inactions, caused plaintiffs emotional distress. Id. at ¶14.

be brought against the State; (2) plaintiffs fail to allege or establish a prima facie case of discrimination under the Equal Protection Clause; (3)defendants are entitled to qualified immunity; (4) defendants are entitled to absolute immunity; and (5) plaintiffs fail to allege or establish a prima facie case of intentional infliction of emotional distress.

For the reasons that follow, defendants' motion to dismiss plaintiffs' equal protection claim **[Doc. #30]** is **DENIED** but defendants' alternative motion for summary judgment **[Doc. #30]** is **GRANTED.** The Court declines to exercise pendent jurisdiction over plaintiffs' state, municipal, and common law claims of negligence and intentional infliction of emotional distress.

### I. MOTION TO DISMISS

Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss this action for failure to state a claim upon which relief may be granted.

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. Spalding, 467 U.S. 69, 73 (1984). When deciding a motion to dismiss for failure to state a claim on which relief can be granted, the court must accept the material facts alleged in the complaint as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. Leeds v. Meltz, 85 F.3d

2

51, 53 (2d Cir. 1996).

The court must not dismiss the action "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Cohen v. Koeniq</u>, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>York v. Ass'n of the Bar of the City of New York</u>, 286 F.3d 122 (2d Cir. 2002) (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).

<u>FACTS</u>

For purposes of the motion to dismiss, the Court accepts the following facts alleged in the complaint as true.

During all times relevant to this action, plaintiffs Pat Snyder and Alexis Davis were residents of Naugatuck, Connecticut. [Compl. Doc. #1 at ¶3].

Defendants Ronald Pugliese and Peter Bosco (the "Officers") were Naugatuck police officers acting in their official capacities. <u>Id.</u> at ¶4. The Officers are sued only in their individual capacities. <u>Id</u>. During all times relevant to this action, defendants were acting under state law. <u>Id.</u> at ¶5. Defendants acted jointly and in concert with each other. <u>Id.</u> at ¶6.

On the late afternoon of November 26, 2001, the defendants reported to the vicinity of 18 Scott Street to take a complaint

from John Lepeska, a tenant at 4 Scott Street, a property owned
by plaintiff Snyder. Id. at ¶7.

"Lepeska accused the plaintiffs, both of whom were present
when the accusation was made, of stealing a bag of mulch from the
front lawn at 4 Scott Street . . . ." Plaintiffs denied the
accusation. Plaintiffs explained that they were "cleaning up
trash from the property which was owned by . . . Snyder." Id. at
¶8.

The Officers "ordered plaintiffs to locate and immediately
turn over to Lepeska everything they had picked up from the front
yard of the premises at 4 Scott Street, and stated further that
if the plaintiffs did not do so, they would arrest plaintiffs for
larceny." Id. at ¶9.

"[P]laintiffs were forced to retrieve the . . . trash from
an outdoor garbage can and present it to Lepeska in a plastic bag
in the presence of defendants." Id. at ¶10.

The Officers "saw that . . . the material in question was
leaves and yard waste. Lepeska thereupon, in the presence of the
defendants, hurled the bag of waste over the plaintiffs' heads
and entered his residence." Id. at ¶11.

The Officers, "although able to do so, took no action to
protect the plaintiffs from the alleged misconduct and took no
action against Lepeska." Id. at ¶12.

"From October 2001 through May 2002, the Officers and other
members of their department have continuously and in a manner
similar to that described above treated plaintiffs less favorably

than other similarly-situated persons residing on Scott Street
and, in particular, have treated plaintiffs more harshly than
they have treated the tenants living at Snyder's property." Id.
at ¶13-1.[2]

The Officers "intentionally treated plaintiffs in a manner
which materially differed from the manner in which they treated
Lepeska, who was similarly situated, and thereby deprived the
plaintiffs of equal protection of the laws in violation of the
Fourteenth Amendment to the United States Constitution." Id. at
¶13-2.

"Plaintiffs suffered the fear that they were outside the
protection of the law, and emotional distress." Id. at ¶14.


### Fourteenth Amendment: Equal Protection Claim

Plaintiffs allege that defendants deprived plaintiffs of
equal protection of the laws in violation of the Fourteenth
Amendment. [Compl. ¶13-2].

The Fourteenth Amendment to the United States Constitution
guarantees that "[n]o state shall . . . deny to any person within
its jurisdiction the equal protection of the laws." This means
the state must treat similarly situated individuals similarly, in
the absence of an adequate reason to distinguish between them.
"The Fourteenth Amendment's promise that no person shall be
denied the equal protection of the laws must coexist with the

---

[2]There are two (2) paragraphs 13. The Court will
differentiate them by referring to paragraphs 13-1 and 13-2.

practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer v. Evans, 517 U.S. 620, 632 (1996)(citations omitted). The Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Id. (citing Heller v. Doe, 509 U.S. 312, 319-320 (1993).

"As a general rule, the equal protection guarantee of the Constitution is satisfied when the government differentiates between persons for a reason that bears a rational relationship to an appropriate governmental interest." Able v. U.S., 155 F.3d 628, 622 (2d Cir. 1998).

Plaintiffs Pat Snyder and Alexis Davies, both white females, claim a deprivation of their right to equal protection of the laws. Plaintiffs do not assert deprivation of equal protection arising from membership in a protected class or group; rather, they claim "disparate enforcement of the law" by the defendant police officers. [Doc. #37 at 4].[3]

---

[3]Specifically, plaintiffs allege that defendants "treated the plaintiffs less favorably than other similarly-situated persons residing on Scott Street and, in particular, have treated the plaintiffs more harshly than they have treated the tenants of the plaintiff Snyder." [Comp. ¶13-1].  They further allege that "defendants intentionally treated the plaintiffs in a manner which materially differed from the manner in which they treated Lepeska, who was similarly situated, and thereby deprived the plaintiffs of equal protection of the laws . . . . " Id. at ¶13-2.

Defendants argue that "[p]laintiffs fail to set forth a cognizable claim based upon membership in an identifiable class, or purposeful discrimination directed toward an identifiable class." [Doc. #31 at 8].  Here, defendants point out, plaintiffs "are merely claiming that their Scott Street tenants or possibly a neighbor were similarly situated to her without further reference to their ages, sex or any other potential form of classification." Id. at 10.

In Village of Willowbrook v. Olech, 528 U.S. 562 (2000), the Supreme Court held that a successful equal protection claim may be "brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564.  See also Harlen Assocs. v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials.").

In "class of one" equal protection claims, general allegations of intentional disparate treatment without a rational basis for the difference in treatment are sufficient to withstand a motion to dismiss.  In DeMuria v. Hawkes, 328 F.3d 704 (2d Cir. 2003), plaintiffs' general allegation that defendant police

7

officer "gave them a different standard of police protection than
that typically afforded a resident of Clinton, Connecticut" met
the minimal level established by <u>Olech</u> for a "class of one" equal
protection claim at the pleading stage.  <u>Id.</u> at 707.  "Although
their complaint does not actually use the word "irrational" as
Olech's did, the allegation of an impermissible motive and of
animus is sufficient to establish an equal protection claim."
<u>Id</u>.  Here, plaintiffs' complaint can fairly be construed as
alleging that defendant police officers intentionally treated
plaintiffs differently then other Scott Street residents and that
there was no rational basis for the difference in treatment.
<u>Olech</u>, 528 U.S. at 564.  Read liberally, plaintiffs' allegations
are sufficient to meet the minimal pleading requirements set
forth in  <u>Olech</u> for a "class of one" equal protection claim at
the pleading stage.  Accordingly, defendants' motion to dismiss
plaintiffs' equal protection claim pursuant to Fed. R. Civ. P.
12(b)(6) is **DENIED.**

II. <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendants also seek summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, arguing there is no genuine issue of material fact to be tried.

The standard for reviewing summary judgment motions is well-established. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The burden of establishing that there is no genuine factual dispute rests with the moving party. See <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of plaintiff, as the non-moving party. <u>Anderson v. Liberty Lobby. Inc.</u>, 477 U.S. 242, 255 (1986). At the same time, when a motion is made and supported as provided in Rule 56, Fed. R. Civ. P., the non-moving party may not rest upon mere allegations or denials of the moving party's pleadings, but instead must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed. R. Civ. P. In other words, the non-moving party must offer such proof as would allow a reasonable jury to return a verdict in his favor. <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 256; <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).  This Court's "function at this stage

is to identify issues to be tried, not decide them." <u>Graham</u>, 230
F.3d at 38. "Only when reasonable minds could not differ as to
the import of the evidence is summary judgment proper." <u>Bryant</u>,
923 F.2d 979, 982 (2d Cir.), <u>cert. denied</u>, 502 U.S. 849 (1991).


   <u>Undisputed Facts</u>

   Based on defendants' Local 56(a)(1) Statement and exhibits
and plaintiff's Local 56(a)2 Statement and exhibits, the
following facts are undisputed.

   At all relevant times, defendants Ronald Pugliese and Peter
Bosco were Naugatuck police officers. [Def. 56(a)(1) Stat., Doc.
#32 at ¶1].  Defendants were acting as uniformed police officers
and not in the capacity of private citizens.  <u>Id.</u> at ¶13.

   On or about November 26, 2001, plaintiff Pat Snyder resided
at 4 Scott Street, Naugatuck, Connecticut. <u>Id.</u> at ¶3. Ms. Snyder
also owned property at 18 Scott Street and 24 Scott Street in
Naugatuck.  <u>Id.</u> at ¶¶22, 25.  Between October 2001 through May
2002, Ms. Snyder resided in both Arizona and Connecticut. <u>Id.</u> at
¶9.  Ms. Snyder resided in Naugatuck from October through
December 2001 and returned to Arizona.  She returned to Naugatuck
from June 2002 to November 2002.  <u>Id.</u> at ¶¶10, 11.

   At all relevant times, Alexis Davies, Snyder's niece, lived
at 4 Scott Street.  <u>Id.</u> at ¶¶63, 71.

   The similarly situated individuals whom plaintiffs Snyder
and/or Davies claim were treated differently by defendants were
Snyder's tenants: John Lepeska, Cyrilla Stoll, Joanne Warren,

10

Byron Parent, Theresa Kiker, and John Desmond.[4]  Id. at ¶¶54,
82. Plaintiffs base their allegations of disparate treatment on
the interactions among plaintiffs, defendants and tenants
described below.  Unless otherwise indicated, the following facts
are undisputed.

    Summary of Interactions

        a)   Tenant John Lepeska

    On November 26, 2001, defendants Pugliese and Bosco reported
to 18 Scott Street to take a complaint from John Lepeska. Def.
56(a)(1) Stat. at 17 (citing Compl. at ¶¶8-12).  Lepeska accused
plaintiffs Snyder and Davies of stealing a bag of mulch from the
property of 4 Scott Street. Id. at ¶¶17, 73 (citing Compl. at
¶¶8-12).  Plaintiffs explained that they had been cleaning up
trash from the property owned by Snyder.  Id.  Plaintiffs removed
the trash or mulch to a trash can located between 8 Scott Street
and 4 Scott Street. Id. at ¶73.

    It is disputed whether the Officers ordered Snyder and
Davies to locate and return to Lepeska everything they had picked
up from the front yard of 4 Scott Street, and whether defendants
stated that, if plaintiffs did not comply, they would be arrested
for larceny. [Compl. at ¶9; Pl. 56(a)(2) Stat. ¶27].  Plaintiff

---

    [4]Plaintiffs' Amended Complaint alleges that defendants
treated plaintiffs less favorably and more harshly than other
similarly-situated persons residing on Scott Street. [Doc. #1,
Compl. at  ¶13].  Plaintiffs named such similarly-situated
individuals in their depositions. [Snyder Depo., at 208-09;
Davies Depo., at 51].

Davies walked approximately ten (10) feet to retrieve the bag of
trash or mulch from the trash can.  [Def. 56(a)(1) Stat. at ¶76].
Then Davies walked approximately sixty to seventy feet from the
location of a trash can to Lepeska, and handed him the bag of
trash or mulch, during which time the Officers followed her.[5]
When Davies handed the bag of trash or mulch to Lepeska, the
defendants were standing approximately ten (10) feet away from
Davies.  Id. at ¶48.  Davies testified that Lepeska threw the bag
of trash in her direction but that she ducked to avoid being
struck.  Id. at ¶78.  Snyder did not see Lepeska throw the bag at
them. Id. at ¶49.  She testified that the bag was not thrown over
her head by Lepeska.  Id. at ¶51.

    It is disputed whether tenant Lepeska threatened plaintiffs
during this time.  Pl. 56(a)(2) Stat. at ¶80.  Snyder testified
she did not hear tenant Lepeska threaten to hit or throw
something at Davies.  Def. 56(a)(1) Stat. at ¶52.  Davies
testified that Lepeska shook his fist at her and threatened to
blow up the house in the presence of the Officers. Pl. 56(a)(2)
Stat. at ¶53 (citing Davies Tr. at 47).  Neither plaintiff

---

[5]Plaintiffs' 56(a)(2) Statement disputes this fact, citing
Davies' deposition testimony at pages 199-202. [Doc. #37-1, Pl.
56(a)(2) Stat. at ¶47].  Davies's deposition ends at page 124.
Assuming that plaintiffs intended to cite the deposition of
plaintiff Snyder at pages 199-202, Snyder testified that Davies
walked sixty to seventy feet from the trash can to tenant
Lepeska, and that the Officers followed her. [Snyder Depo., at
200, lines 2-3 and 11-13].  Moreover, plaintiffs agreed that
Davies was followed by the Officers as she returned the bag of
trash or mulch to tenant Lepeska. [Doc. #37-1, Pl. 56(a)(2) Stat.
at ¶77].  Therefore, the court regards this fact to be
undisputed.

requested that tenant Lepeska be arrested on November 26, 2001.
Def. 56(a)(1) Stat. at 81.  Davies testified that the Officers
"intentionally didn't give us the time of day; they intentionally
told us that they were going to arrest us for grand larceny."
Id. at ¶85.

###         b)    Interactions Involving Tenants Cyrilla Stoll & Joanne Warren

Snyder testified that between September and October of 2001,
her tenant Cyrilla Stoll complained to her that Officer Bosco
made the tenant feel nervous. Officer Bosco reported to
plaintiff's property at 18 Scott Street in response to a
complaint by tenant Lepeska.  Id. at ¶35.

On or about June 6, 2002, Officer Bosco entered the premises
of tenants Stoll and Joanne Warren, but plaintiff Snyder did not
talk to Officer Bosco that day. Id. at ¶36. Stoll and Warren
filed complaints against Snyder with the Naugatuck Police
Department.  Id. at ¶37.

Tenant Stoll was arrested by  Naugatuck police officers on
two occasions at the home she rented from plaintiff at 18 Scott
Street.  Id. at ¶55.

In August or September of 2002, Snyder testified, Officer
Bosco arrived at her house in response to a claim by tenant
Warren that Snyder had yelled at Warren's children.  Id. at ¶40.

Plaintiff Snyder claims that in the fall of 2002, Officer
Bosco glared and laughed at her when responding to a complaint by
tenant Warren.  Id. at ¶38.

13

      c)   Tenants Byron Parent & John Desmond

In the summer of 2001, Snyder requested assistance from the Naugatuck Police Department to document a property damage claim at her 18 Scott Street property.  Id. at ¶21-22.  Officer Pugliese responded to the call.  Id. Snyder testified that during the interaction she did not recall Officer Pugliese being intimidating towards her, Id. at ¶23, although Snyder testified that Officer Pugliese acted in an intimidating and aggressive manner toward her tenant Byron Parent.  Id. at ¶23, 56.

Later that day, Snyder's tenants, Byron Parent and John Desmond, were outside Snyder's 24 Scott Street property drinking alcohol and John Desmond was smoking marijuana.  Id. at ¶¶24-26. Snyder testified that her tenants attempted to punch her. Officer Pugliese responded to the call.  Id. at ¶27.  Snyder testified that Officer Pugliese requested that she go to the Naugatuck police department to make a statement regarding the incident involving these tenants.  Id. at ¶28. Snyder could not remember if she told Officer Pugliese that she wanted to file a report upon her arrival at the Police Department.  Id. at ¶29.

      d)   Tenant Theresa Kiker

Snyder interacted with Officer Pugliese regarding an incident with her tenant Theresa Kiker at 8 Scott Street.  Id. at ¶¶30-33.  Snyder could not recall what happened first but she recalled that her husband informed her that Kiker would scream a lot.  Id. at ¶31. On one occasion, Kiker called the police to 8

14

Scott Street and Officer Pugliese responded to the call. Snyder testified that Officer Pugliese told her that she should not be calling the dog warden regarding tenant Kiker.[6] Snyder testified that in July, August or September of 2001, Officer Pugliese walked through her front door and yelled at her to (paraphrased) "knock it off with Kiker." Id. at ¶33.

Snyder testified that, in the summer of 2001, Officer Pugliese responded to a complaint from her tenant Kiker. Snyder testified that Officer Pugliese yelled, "fuck you, Kelvin" to Snyder's employee. Id. at ¶38. Kelvin Aakjar was Snyder's tenant caretaker. Id. at 57. Aakjar has been arrested by other Naugatuck Police Officers. Id. At 57

During a separate incident in the summer of 2002, Snyder testified that Officer Bosco reported to her property in response to a complaint by tenant Kiker. Id. at ¶41. Tenant Kiker accused Snyder of throwing trash into the tenant's yard, but no arrest was made in response to this claim. Id

---

[6]Plaintiffs' Local Rule 56 Statement disagrees with this statement of fact and cites Snyder's deposition, pages 70-75. [Def. 56(a)(1) Stat. at ¶32]. However, plaintiff Snyder testified, "I thought that that was unusual that he [officer Pugliese] would be telling me not to call the dog warden." [Snyder Depo., page 75, lines 2-3]. Additionally, plaintiffs' 56(a)(2) Statement states that "Defendant Pugliese . . . came over to the property and began yelling at Snyder and berating her for calling the dog warden." [Pl. 56(a)(2) Stat. Sec. II, ¶6]. Therefore, the Court construes this fact to be undisputed.

e)   <u>Interactions involving Plaintiffs Snyder & Davies</u>

Snyder testified that her first interaction with Officers Pugliese and Bosco was sometime in October or November of 2001. <u>Id.</u> at ¶15.  Snyder recalled she was standing in her yard at 4 Scott Street, holding a flashlight and talking to a potential new apartment renter.  <u>Id.</u> at ¶¶14(a), 68.  The police officers told Snyder to "get off this street now or its gonna get ugly."  <u>Id.</u> at ¶14(b).  Snyder believes that the Officers told her to get off the street because someone had complained that she was shining a flashlight into another individual or tenant's eyes.  <u>Id.</u> at ¶19. Snyder did not recall making a complaint against the Officers for being yelled at.  <u>Id.</u> at ¶16.

Snyder testified that in the summer of 2002, Officer Pugliese responded to a "911" call at her home.  <u>Id.</u> at ¶42. Snyder denied making a "911" call and no arrest was made.  <u>Id</u>.

It is disputed whether the Officers instructed Davies that she could not go on the Scott Street properties to collect rent. <u>Id.</u> at ¶87.

Davie testified that Officer Bosco accompanied tenant Lepeska on a walk-through inspection of his apartment, but she was not provided a similar service by the Naugatuck Police Department.  <u>Id.</u> at ¶88.  Davies did not specifically request that Officers Bosco or Pugliese accompany her on an inspection of Lepeska's apartment.  <u>Id</u>.  An unknown police dispatcher refused to do a similar inspection at Davies' request.  <u>Id.</u> at ¶69(ii).

Officer Bosco left a telephone message with Davies stating

16

that tenant Cyrilla Stoll had requested that Davies stay away
from her, her boyfriend, and her dog, and that if she had any
business with regards to 18 Scott Street to inform the police.
Id. at ¶69(iii).

Davies testified that Officer Pugliese failed to inform
individuals that false reporting is a misdemeanor. Davies
testified that Officer Bosco called Davies by her "real name" in
front of Snyder's tenants.  Id. at ¶¶89, 91.

Plaintiffs were never arrested by Officers Pugliese or
Bosco.  Id. ¶¶39, 87.  They never missed any work as a result of
the incidents set forth in the Complaint.  Id. at ¶90.

Davis testified that tenant Lepeska was arrested by a member
of the Naugatuck Police Department pursuant to a complaint made
by Snyder.  Id. at ¶84.

Tenants John Lepeska, Cyrilla Stoll, Joanne Warren, Theresa
Kiker and John Desmond were all eventually evicted from Snyder's
properties. [Snyder Depo at 208].


Equal Protection Claim

Defendants assert that plaintiffs cannot, as a matter of
law, establish a claim for a denial of equal protection because
they cannot establish that they were selectively treated as
compared to others similarly situated and the events on which
they base their claim do not constitute differential treatment.
[Doc. #40 at 5].

Plaintiffs do not assert membership in a protected class or

17

group; rather, they allege selective enforcement of the law, or "disparate enforcement of the law," by the defendant police officers. [Doc. #37 at 4]. As set forth above, "[a]lthough the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) (citation omitted).

A violation of equal protection by selective enforcement arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) such selective treatment was based upon impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (internal citations and quotation marks omitted). Although the Second Circuit has declined to resolve the question of whether the Supreme Court's decision in Olech changed the requirement that malice or bad faith must be shown in order to state a valid "class of one" equal protection claim, see Harlen Assocs., 273 F.3d at 499-500; Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001), "such a person would still be required to show, not only

"irrational and wholly arbitrary" acts, but also <u>intentional</u> disparate treatment." <u>Giordano</u>, 274 F.3d at 751 (citing <u>Olech</u>, 528 U.S. at 264-65 (observing that the Court's cases have recognized "class of one" equal-protection claims "where the plaintiff alleges that she has been <u>intentionally</u> treated differently from others similarly situated and that there is no rational basis for the difference in treatment."); <u>see also</u> <u>Sioux City Bridge Co. v. Dakota County</u>, 260 U.S. 441, 445 (1923) (noting that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against <u>intentional</u> and arbitrary discrimination.") (emphasis in original)); <u>see</u> <u>Zeigler v. Town of Kent</u>, 258 F. Supp 2d 49, 58 (D. Conn. 2003). Accordingly, in order to survive this motion for summary judgment, plaintiffs must prove that: "(1) a group of similarly situated individuals exist; (2) they were treated differently than the group; (3) the police officers intentionally treated them differently; and (4) the motivation for the disparate treatment was: (a) based on impermissible reasons such as race; (b) based on ill will or personal animosity; or (c) made for wholly arbitrary reasons lacking any rational basis." <u>Payne v. Huntington Union Free School District</u>, 219 F. Supp. 2d 273, 278 (E.D.N.Y. 2002).

First, plaintiffs have each alleged a class of one membership, asserting disparate enforcement of the law against them as compared to other Scott Street residents. Accordingly, the group against whom plaintiffs allege they should be compared

19

is "other Scott Street residents." Six individuals, all tenants
of plaintiffs, are specifically mentioned in plaintiffs'
depositions as members of this group.

Plaintiffs' opposition brief offers little assistance in
addressing the remaining elements of the equal protection claim.[7]
Quoting Olech, plaintiffs acknowledge that they must prove that
they have been "intentionally treated differently from other
similarly situated and that there is no rational basis for the
difference in treatment." [Doc. #37 at 5, quoting Olech, 528 U.S.
at 564). However, they provided no further analysis applying the
law to the facts on this key question. Instead, plaintiffs state
"it is unclear what the defendants are talking about." [Doc. #37
at 4]. The full extent of plaintiffs' argument is the following
paragraph: "[Defendants] speak of a need to allege and prove
intent to discriminate, but do not correlate that to the evidence
which, in one particularly dramatic instance, shows that the
defendants forced the plaintiffs to give a bag of literal garbage
they had picked up from their own property to a tenant who at
that very time was assaulting and threatening them, yet took no
action whatsoever against that tenant. This is an obvious
disparate enforcement of the law. Other instances of disparate

---

[7]Plaintiffs' opposition papers, signed by experienced
counsel, offer a brief two and a half page argument in support of
their equal protection claim. [Doc. #37 at 4-6. In addition to
the introduction, Id. at 1-2, the opposition brief addresses
whether defendants were acting under color of state law, Id. at
2-4; defendants' qualified immunity claim, Id. at 6-9; and
plaintiffs' claim of intentional infliction of emotional
distress. Id. at 9-12. The remainder of the memorandum provides
the standard of law for summary judgment. Id. at 12-16.

treatment, less dramatic, also are testified to." Id. at 4.

Considering the Lepeska incident, which is the specific subject of plaintiffs' fourteen (14) paragraph, three (3) page complaint, no reasonable jury could find in favor of plaintiffs on their equal protection claim. There is no disparate treatment. Although the Officers allegedly threatened to arrest plaintiffs if they did not return the property taken from Lepeska's front lawn, defendants took no further action against plaintiffs and no arrests were made. [Compl. at ¶9]. Similarly, the Officers took no enforcement action against Lepeska although he allegedly threw the bag at plaintiffs. [Compl. at ¶ 11-12]. Even if the Court were to assume plaintiffs' version of these facts is undisputed, which it is not, plaintiffs were treated no differently then Lepeska.

As to the generalized allegations contained in paragraph 13-1 of the Complaint,[8] plaintiffs can point to no evidence in the record that would support a jury finding that defendants treated plaintiffs differently from other similarly situated Scott Street residents.  The depositions of plaintiffs Snyder and Davies

---

[8]Paragraph 13-1 of the Complaint states,

> From October 2001, through May 2002, the defendants and other members of their department have continuously and in a manner similar to that described above treated the plaintiffs less favorably than other similarly-situated persons residing on Scott Street and, in particular, have treated the plaintiffs more harshly than they have treated the tenants of the plaintiff Snyder.

Compl. at ¶13-1.

describe numerous instances in which Officers Pugliese and/or Bosco were called to settle neighborhood disputes.[9]  As a result of some of these interactions between other Scott Street residents and Officers Pugliese and/or Bosco: Officer Bosco made tenant Stoll feel nervous, Officer Bosco entered the premises of tenants Stoll and Warren, tenant Stoll was arrested, Officer Pugliese acted in an intimidating manner toward tenant Parent, and Officer Pugliese yelled obscenities at tenant/caretaker Aakjar. On a separate occasion, Aakjar was arrested by the Naugatuck police.  Tenants Lepeska, Stoll, Warren, Kiker, and Desmond were all eventually evicted from Snyder's properties.

In comparison, the following resulted from interactions between plaintiffs Snyder and/or Davies and Officers Pugliese and/or Bosco: Officer Pugliese advised plaintiff Snyder to make a statement with the Naugatuck Police Department regarding an incident between her and tenants Parent and Desmond; Officer Pugliese warned Snyder not to cause problems with tenant Kiker; defendants told  Snyder to leave the street after an unidentified individual complained that Snyder shined a flashlight in his/her eyes (Snyder did not file a complaint); Officer Bosco glared at plaintiff Snyder after tenant Warren complained about her; Officer Bosco performed a walk-through inspection for tenant Lepeska but not for Davies (Davies testified she never requested that defendants accompany her on a walk-through inspection); and

---

[9]While the disputes were frequently between plaintiffs and plaintiff Snyder's tenants, they are not landlord-tenant disputes, and not all of them involved plaintiffs.

Officer Bosco called Davies by her real name.   Neither plaintiff was ever arrested by defendants. Neither plaintiff lost time at work due to their contacts with the Officers. Plaintiffs never filed a citizens complaint against the defendants. Plaintiffs did not file complaints against Lepeska or any other tenant.

These interactions, in sum, reveal that defendants gave plaintiffs treatment equal to, if not <u>preferential</u> to, the treatment afforded other Scott Street residents.[10]  Plaintiffs may have preferred that defendants arrest tenant Lepeska after the alleged trash-throwing incident, yet plaintiffs never requested that the Officers arrest Lepeska. There is no evidence in the record that plaintiffs filed either a police report or a citizens complaint against the Officers. Moreover, Officer Bosco did <u>not</u> arrest plaintiff Snyder (1) after tenant Kiker accused her of throwing trash in her yard,[11] <u>or</u> (2) in response to a 911 call made from Snyder's home.  Even when plaintiffs disagreed with the Officers' handling of a situation, the record establishes a reasonable basis for the Officers' conduct.  For example, when defendants told Snyder to get off the street, she

---

[10]It is unclear in what ways plaintiffs contend the other residents of Scott Street were "similarly situated" except that they all lived on Scott Street. Plaintiff Snyder is the only identified property owner on Scott Street.  Davies is Snyder's niece, property manager and Scott Street tenant.

[11]The Court notes that plaintiffs base their disparate treatment claim, in part, on defendants' failure to arrest tenant Lepeska after he allegedly threw trash, yet Officer Bosco declined to arrest Snyder after tenant Kiker accused Snyder of doing the very same thing. [Def. 56(a)(1) Stat. at ¶41].

said that this order was likely due to her shining a flashlight
in an individual's eyes. [Def. 56(a)(1) Stat. ¶19].

Similarly, plaintiffs fail to proffer evidence that the
Officers intentionally treated them differently from other Scott
Street residents. Payne, 219 F. Supp. 2d at 278. That is,
plaintiffs proffer no evidence that Officers Pugliese and Bosco
knew they were treating plaintiffs differently then they treated
other Scott Street residents or consciously decided to do so.
Plaintiffs' conclusory statements provide no basis for imputing
an intention to subject plaintiffs to disparate treatment to
either defendant.

Even assuming that plaintiffs could prove that they were
treated differently from other Scott Street residents, and that
the Officers intentionally treated plaintiffs differently, their
claim would still fail. To prevail, plaintiffs must prove either
improper motive (ill will) or that the Officers' actions lacked
any rational basis. Id. at 281-82. In their opposition brief,
plaintiffs rely on the following incidents to demonstrate
disparate treatment.

1.  "[O]n November 26, 2001, the defendants threatened to
    arrest [plaintiffs] unless they took a bag of garbage
    out of a trash can on their property and delivered it
    to a tenant of the plaintiff Snyder.  At the same time
    the tenant threw the bag of garbage at the plaintiff
    Davies in [defendants] presence, missing her only
    because she ducked, and shook his fist and screamed at

24

both plaintiffs and threatened to blow up their house. All of these crimes took place in the presence of the defendants, who took no action and left the area. [Doc. #37 at 1].

2.    "On other occasions Naugatuck officers treated the tenants more favorable than the plaintiffs when obviously false complaints were made by the tenants." Id. at 1-2.

3.    "On one other occasion, the two defendants together ordered the plaintiffs off the street and into their residences." Id. at 2.

4.    "On another, one of the defendants entered the plaintiff Snyder's residence without her permission and without knocking, for no apparent purpose other than to threaten her." Id.

However, plaintiffs proffer no analysis of the evidence which would support a finding of ill will or the absence of a rational basis.  It is not enough to assert that the Officers acted with ill will or without a rational basis for their actions. Plaintiff must offer evidence from which a jury could reasonable find that the Officers "took [their] actions because of personal animus against [plaintiffs]-active malicious ill will toward [them]."  Payne, 219 F. Supp. 2d at 283; see Harlen, 273 F.3d at 502 (Second Circuit noted it would "uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims.").  "It is personal

animus, however, that the Equal Protection Clause prohibits."
Payne, 219 F. Supp. 2d at 283.Accordingly, defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56(b) is **GRANTED** on
plaintiffs' equal protection claim.

### State, Municipal and Common Law Claims

In addition to the Equal Protection claim, the pending
action includes claimed violations of state, municipal and common
law.

Pendent jurisdiction is a doctrine of discretion; "[i]ts
justification lies in considerations of judicial economy,
convenience, and fairness to litigants; if these are not present
a federal court should hesitate to exercise jurisdiction over
state claims." United Mine Workers v. Gibbs, 383 U.S. 715, 726
(1966); accord Morse v. University of Vermont, 973 F.2d 122, 127
(2d Cir. 1992); Castellano v. Board of Trustees, 937 F.2d 752,
758 (2d Cir.), cert denied, 502 U.S. 941 (1991).

Generally, where "the federal claims are dismissed before
trial . . ., the state claims should be dismissed as well."
United Mine Workers, 383 U.S. at 726; see also Castellano, 937
F.2d at 758; Andreo v. Friedlander, No. H-85-551, 1986 WL 15663,
at *13 (D. Conn. Apr. 28, 1986); cf. Castellano, 937 F.2d at 758
(pendent jurisdiction implicates comity concerns); but cf. Finz
v. Schlesinger, 957 F.2d 78, 84 (2d Cir.) (where dismissal of a
federal action involves findings related to state claim, court
should address state issues); cert. denied, 506 U.S. 822 (1992).

26

Following these principles, the Court declines to exercise pendent jurisdiction over the state, municipal and common law claims in light of the dismissal of plaintiffs' federal constitutional claim.

<u>CONCLUSION</u>

Accordingly, defendants' Motion to Dismiss plaintiffs' federal constitutional claim **[Doc. #30]** is **DENIED.**

Defendants' Motion for Summary Judgment on plaintiffs' federal constitutional claim **[Doc. #30]** is **GRANTED.**

The Court declines to exercise pendent jurisdiction over plaintiffs' state, municipal and common law claims.

The Clerk of the Court is directed to close the case.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. #19] on May 29, 2003 with appeal to the Court of Appeals.

ENTERED at Bridgeport this 8th day of September 2004.

___/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

27